GEM PROPERTIES, INC. *vs.* BOARD OF APPEALS OF MILTON.

Norfolk.    March 9, 1960. — May 16, 1960.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE, & CUTTER, JJ.

*Zoning.    Milton.    Way,* Private: way "plotted . . . for ultimate public use."

"Private ways plotted . . . for ultimate public use" in a provision of the zoning by-law of Milton defining "Street" as meaning "public ways . . . private ways open for public use, and private ways plotted or laid out for ultimate public use, whether or not constructed," meant private ways designed to be dedicated wholly to public use. [104]

"Street" as defined in the zoning by-law of Milton did not include the location of an easement, reserved by the owner of land in a residential district when he conveyed a portion of his land fronting on a public way, for "establishing, constructing, and maintaining therein utilities for drainage, water, sewer, electricity, gas, etc." and for "passing and repassing . . . [between the public way and the remaining rear portion of the grantor's land] and any subdivision thereof, said easement to remain forever open and unobstructed," nor include an extension of such location into the rear portion of the land; and lots into which the rear portion was divided and which each abutted on the extension did not have street frontage as required by the zoning by-law. [104]

An amendment of the Milton zoning by-law, whereby no lot in a residential district could be built upon unless it had street frontage, as applied to two rear lots not fronting on any street but otherwise conforming to the by-law as amended and not shown to be substantially different from nearby lots apart from street frontage, unreasonably deprived the owner of the lots of their potential value and was invalid where it appeared that previous to the amendment street frontage had not been required, the lots had been shown on a recorded plan endorsed by the town's planning board "Approval under the subdivision control law not required," and the front lots between the rear lots and a street had been conveyed away, and that an adequate easement for access and public utilities from the street to the rear lots had been reserved across the front lots; it was immaterial that the owners of the front lots, with knowledge of the easement across them, had improvidently placed houses on them very close to the location of the easement. [104–106]

BILL IN EQUITY, filed in the Superior Court on October 11, 1957.

The suit was heard by *Dewing, J.*

*Alexander E. Finger,* for the plaintiff.

*John J. Murray,* Town Counsel, for the defendant.

CUTTER, J. This is an appeal to the Superior Court from a decision[1] of the board of appeals of Milton, following the denial by the building inspector of building permits for a single family dwelling on each of two lots (30A and 30B) owned by Gem Properties, Inc. (Gem). In its decision, which had the effect of affirming the denial of a permit, the board of appeals also denied a variance from the terms of the Milton zoning by-law with respect to these lots. By final decree it was determined that no modification of the board's decision denying a variance was required. Gem has appealed. The evidence is reported.

The trial judge found that on September 7, 1950, one Gordon, Gem's "principal officer and stockholder," obtained the planning board's approval of a plan showing a "layout of twenty-nine lots all fronting either on Badger Circle or Pleasant Street, both . . . laid out as public ways. Another lot, numbered 30, . . . was shown as in the rear of lots . . . 9, 10, and 11 and otherwise surrounded by land of the town . . . and having no access to a public way." The evidence showed that the town land was used for a cemetery. On December 28, 1953, Gordon submitted a plan showing lots 10 and 11, fronting on Badger Circle, with lot 30 in the rear divided into lots numbered 30A (24,253 sq. ft.) and 30B (30,403 sq. ft.). "Access to these two rear lots was shown by a 20-foot right of way along the line dividing lots 10 and 11, taking 10 feet off of each lot for their entire depth and continuing on the division line of lots

---

[1] General Laws c. 40A, § 13 (as amended through St. 1955, c. 325, § 1), permits an appeal to the board of appeals "by any person aggrieved by reason of his inability to obtain a permit . . . under the provisions of this chapter . . . or . . . by any . . . decision of the inspector of buildings . . . in violation of . . . this chapter, or any . . . by-law adopted thereunder." Section 15 (as amended through St. 1958, c. 381) gives the board power to hear such appeals and to authorize variances. Appeals to the Superior Court are governed by § 21 (as amended through St. 1958, c. 175).

Gem Properties, Inc. *v.* Board of Appeals of Milton.

30A and 30B . . . approximately 130 feet." It was indorsed for the planning board on December 28, 1953, "Approval under the subdivision control law not required," and on August 13, 1954, was recorded in the registry of deeds.

Gordon had conveyed to Gem several lots, including lots 10, 11, and 30, "and on January 8, 1953 [prior to the filing of the plan of December 28, 1953, showing lots 30A and 30B], Gem conveyed . . . lots 10 and 11 to one Lindgren with a reservation of a 20-foot easement for specific public utilities and '. . . for . . . passing and repassing to and from Badger Circle to . . . lot 30 and any subdivision thereof, said easement to remain forever open and unobstructed.' " Cf. *Siegemund* v. *Building Commr. of Boston,* 259 Mass. 329, 333. At some time, as appears from a page

of the town atlas which was an exhibit, the owners of lots 10 and 11 improvidently placed parts of their dwellings within a very few feet of the right of way. Although (as the trial judge found) that "easement . . . was a matter of record at the time they purchased their respective lots," the proximity of these buildings to the right of way was a principal consideration leading the board of appeals to deny a variance.

On June 1, 1957, Gem requested and the building inspector denied the building permits already mentioned. Gem then appealed to the board of appeals, which filed its decision on September 27, 1957, after a public hearing at which various property owners protested any variance.

The zoning by-law in effect on June 1, 1957, provided in § VI, A, 4, "Frontage . . . shall be determined as follows: The distance shall be measured along the street line from one side line of the lot to the other and the distance shall also be measured between said side lines along a line which marks the required front setback of the dwelling on such lot, and the longer of said distances shall determine the frontage of such lot."[2] "Street" was defined in the by-law (§ I, A, 1) as meaning "public ways . . . private ways open for public use, and private ways plotted or laid out for ultimate public use, whether or not constructed." Lots 30A and 30B were in a Residence C district as to which § VI, A, 3, required that a lot of this character contain "not less than 7,500 square feet each and . . . [have] a frontage of not less than 75 feet."

In the view we take of the case, we need not determine

---

[2] Prior to April 26, 1957, § VI, A, 4, read, "Frontage . . . shall be determined as follows: In the case of a lot fronting on a street, the distance shall be measured along the street line from one side line of the lot to the other and the distance shall also be measured between said side lines along a line which marks the required front setback of the dwelling on such lot, and the longer of said distances shall determine the frontage of such lot. In the case of a lot not fronting on any street, the distance shall be measured from one side line of the lot to the other along the line designated as the front line of the lot on the plot filed in accordance with this by-law with the [b]uilding [i]nspector as a part of an application for a building permit, and such distance shall determine the frontage of such lot." The amended form of this section found in the body of the opinion was adopted on March 9, 1957, and was approved by the Attorney General on April 26, 1957.

whether, if any variance was required, the trial judge was right in concluding that the board of appeals could properly deny such a variance, notwithstanding the hardship seemingly involved in preventing Gem from using nearly 55,000 square feet of land for any building purpose. See *Pendergast* v. *Board of Appeals of Barnstable,* 331 Mass. 555, 557–560; *Sheehan* v. *Board of Appeals of Saugus,* 332 Mass. 188, 189. Cf. *McHugh* v. *Board of Zoning Adjustment of Boston,* 336 Mass. 682, 690. It, however, must be determined whether the 1957 amendment of § VI, A, 4, of the zoning by-law does prevent issuing a building permit to Gem.

It may reasonably be contended that, even after the 1957 amendment of § VI, A, 4, the frontage of lots 30A and 30B upon the right of way as extended into old lot 30 by the plan filed December 28, 1953, was sufficient to satisfy the amended by-law. At the time of the 1957 amendment, there was no change in § I, A, 1, of the zoning by-law defining "street" as including "private ways *plotted* . . . for *ultimate* public use, *whether or not constructed*" (emphasis supplied). This ambiguous definition could be regarded as broad enough to include contemplated, "plotted," private ways, in the sense of ways wholly in private ownership by reason of "ownership of easements . . . over [the] land of another person" which, when built, will be open to and "susceptible of use by the public . . . for purposes of travel, not merely incidental to . . . use by the owner thereof, in a manner similar to . . . use for . . . travel of a public way of the same general nature." See *Opinion of the Justices,* 313 Mass. 779, 781–783. See also *Tehan* v. *Security Natl. Bank of Springfield,* 340 Mass. 176, 181–182. In view of the circumstance that the reserved easement included "establishing, constructing, and maintaining therein utilities for drainage, water, sewer, electricity, gas etc.," as well as the right to pass and repass, any roadway actually constructed to lead to dwellings on lots 30A and 30B, as a practical matter, would be likely to be used, and to be open to public use, in a manner substantially similar to the

use which actually would be made of a narrow, dead end public side street leading to only two houses. Nevertheless, the circumstance that in § I, A, 1, "private ways plotted . . . for ultimate public use" are equated with "public ways" and with "private ways open for public use" leads us to conclude that "private ways plotted . . . for ultimate public use" in context means ways designed to be dedicated wholly to public use and not rights of way, like this one, appurtenant to back lots. It may be that the owners of the dominant land would not be able, in all respects, to bring about a dedication of the easement to public use.

Even if the right of way is not a "street" within § I, A, 1, on another ground § VI, A, 4, as amended in 1957, may not be applicable to prevent building on lots 30A and 30B in the manner permitted prior to the 1957 amendment. The board of appeals assumed that the 1957 amendment "did have the effect of making lots 30A and 30B nonbuildable lots." Prior to the 1957 amendment (see footnote 2, *supra*), § VI, A, 4, would have permitted on these lots any buildings allowed in a Residence C zone. The 1957 amendment thus in effect made lots 30A and 30B an area within which no building could be built, solely because of lack of street frontage which was not required by the zoning by-law when the plan was filed on December 28, 1953, or on January 8, 1953, when the right of way was reserved. We do not find in the record any zoning justification or objective (see *Caires* v. *Building Commr. of Hingham,* 323 Mass. 589, 593) for thus destroying all potential value in over an acre of land for any building whatsoever. The land, apart from the matter of street frontage, is not shown to be substantially different from nearby lots. The record suggests that lots 30A and 30B were "unsuitable . . . as building lots" because "a very large amount of fill would be necessary before they could be so utilized." Any such difference relates only to the expense which the owners would incur in building, a matter for the owners to decide. Lots 30A and 30B were not shown to have changed in character

either before or after 1953 although, of course, a substantial amount of building near Badger Circle had taken place.[3] Proximity to a cemetery may not enhance value but it is not a reason for preventing all residence use of nearby land. Area requirements under the zoning by-law can be and have been satisfied. Gem reserved adequate access to meet the terms of then existing zoning provisions. Cf. situation in *Cary* v. *Board of Appeals of Worcester,* 340 Mass. 748, 750, where the owners of a lot with knowledge of zoning provisions dealt with front land in a manner which accentuated the disadvantages of rear land. On the record this is a case "[w]here the application of the [amended] by-law to a particular parcel of land or to a specific use . . . has no . . . substantial relation to the public safety, public health or public welfare but would amount to an arbitrary, unreasonable, and oppressive deprivation of the owner's interest in his private property." Such an application of the amendment cannot be permitted. See *Barney & Carey Co.* v. *Milton,* 324 Mass. 440, 444–450. See also *Caputo* v. *Board of Appeals of Somerville,* 331 Mass. 547, 549; *Shapiro* v. *Cambridge,* 340 Mass. 652, 658.

The judge did find "that the physical characteristics of lots 30A and 30B tend to make them unsuitable for building lots." We interpret this as being, as suggested above, a matter only of construction expense. His ruling that "to grant the variance . . . would result in a substantial detriment to the public good and . . . derogate from the intent . . . of the zoning law" was based principally on the amendment itself. Prior to that amendment, the zoning law permitted the use which Gem now wishes to make of lots 30A and 30B. The recorded plan filed with the plan-

---

[3] The plan filed December 28, 1953, was prepared after the deed to Lindgren in January, 1953, and was not recorded until August 13, 1954. Nevertheless, Lindgren (and those claiming under him) were fully charged by the deed with notice of the comprehensive easement and of the possible subdivision of lot 30. If the owners of the lots subject to the easement thereafter imprudently built too close to the right of way, it would be inequitable to deprive Gem of any rights which it had when it reserved the easement, merely for the protection of these owners from an active use of the right of way.

ning board on December 28, 1953, was consistent with the then existing policy of the zoning by-law. The amendment, in its particular application to these lots (adopted at a time when it was no longer possible for Gem to provide frontage which conforms to the 1957 amendment), thus operates with such harshness as to make this particular application invalid. Even if the amendment is valid as applied generally, in its specific application there is no perceptible benefit to the public interest in Milton to warrant what is essentially confiscation of Gem's property.[4]

No weight whatsoever is to be given to the fact that houses were built on lots 10 and 11 by the owners close to the right of way. The owners did this at their peril (see footnote 3, *supra*), and they equitably should bear any burden of eliminating hazards to the public health and safety, if there are any, caused by reasonable use of the right of way to give access to lots 30A and 30B.

The final decree is reversed. A new final decree is to be entered (a) stating that the board exceeded its authority in denying Gem's appeal from the refusal of a permit on the ground of the provisions of § VI, A, 4, of the zoning by-law as amended; (b) annulling the decision of the board; (c) directing the board to take further proceedings upon the appeal consistent with the applicable statutes and with this opinion; and (d) ordering that the clerk within thirty days after the entry of the decree send an attested copy thereof to the board.

*So ordered.*

---

[4] There is no occasion to consider or to rely upon G. L. c. 40A, § 5A, inserted by St. 1958, c. 492, which is designed to prevent, in circumstances to which it applies, oppressive application of zoning amendments in cases at least analogous. See St. 1960, c. 291.