FRAMINGHAM CLINIC, INC. & others *vs.* BOARD OF
SELECTMEN OF SOUTHBOROUGH & another.[1]

Suffolk.    January 7, 1977. — September 8, 1977.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & LIACOS, JJ.

*Zoning,* Abortion clinic.   *Constitutional Law,* Abortion.   *Abortion.*

An amendment to the zoning by-law of a town prohibiting "abortion
clinics" in all districts was invalid as an unconstitutional interfer-
ence with the effectuation of a woman's counselled decision to ter-
minate her pregnancy during the first trimester [283-288]; HENNES-
SEY, C.J., concurring, with whom QUIRICO, J., joined, on the ground
that the amendment was not valid as a matter of statutory construc-
tion [289].

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on November 16, 1976.

The case was reserved and reported by *Wilkins,* J.

*Susan G. Kupfer* (*Linda M. Scholle & Paul Levenson*
with her) for the plaintiffs.

*William H. Shaughnessy* for the interveners.

*Frederick A. Busconi* for the defendants.

*John J. O'Neill,* amicus curiae, submitted a brief.

KAPLAN, J.   The plaintiffs are Framingham Clinic, Inc.,
a for-profit corporation organized to operate a gynecolog-
ical clinic in the town of Southborough, Massachusetts;
three persons who organized the corporation and were
serving as its directors; a physician specializing in obstet-
rics and gynecology who had undertaken to act as medical
director of the clinic; and two pseudonymous women of
childbearing age, residents of Southborough, who wished
to have available to them in the town a clinic of the type

---

[1] The other original parties to the action are mentioned in the text;
and see note 7 *infra.*

described. The defendants are the board of selectmen of the town and the town's building inspector who was charged with enforcing the town's zoning by-law. The action, commenced in the Supreme Judicial Court for Suffolk County, sought to have a certain amendment of the zoning by-law regarding so called "abortion clinics" declared invalid, and its enforcement enjoined.

If allowed to function, the clinic would assist patients with comprehensive family planning and offer them gynecological services, all on an ambulatory, out-patient basis. The services would include procedures, using the "vacuum aspirator method," for termination of pregnancies that had not advanced beyond the first trimester. Chosen to house the clinic, but requiring renovation for the purpose, was a one-story office building of masonry construction located at 304 Turnpike Road, Southborough, part of an "industrial park" on the northerly side of Route 9, a State highway. The corporation entered into a lease of the premises in November, 1975, to run for ten years from February, 1976, or from the date of the issuance to it of a "determination of need" by the Commonwealth's Department of Public Health, if that should happen earlier.[2]

In connection with its application for the determination of need (see G. L. c. 111, §§ 25C, 51), the corporation was required by a regulation of the Department of Public Health to show that the clinic would not be in violation of any applicable zoning ordinance or by-law. See Reg. 30.7 of D.P.H., Mass. Determination of Need Regs. (1975, 1976), which sought to accommodate regional planning of the location of health facilities to the municipal arrangements as to land use. The corporation obtained the necessary assurance on November 20, 1975, in the form of a communication from the board of selectmen (through its administrative assistant), forwarding a statement by the town counsel. Counsel referred to § IV, 7, of Southbor-

---

[2] The rent was $2,000 monthly, but because of the delay in launching the project the rent was reduced by agreement from July through December, 1976.

ough's zoning by-law setting out permitted uses in "industrial park districts." (It may be noted that among these uses were many permitted in "research, scientific and professional districts," and among the latter were many uses permitted in "residence A districts."[3])

A public hearing regarding the application for the determination of need was held under the auspices of the Department of Public Health in June, 1976. When the present action was filed, preliminary steps in the approval process had been accomplished, favorable reports having been received from the appropriate regional agencies; and the application was before the public health council of the department for final action.

On July 28, 1976, however, following the hearing on the application for the determination of need, the town's planning board held a public hearing to consider an amendment to the zoning by-law concerning "abortion clinics." In reporting to the town meeting its affirmative recom-

---

[3] Section IV, 7, of the by-law is as follows (town counsel referred to 7, A[2]):

"7. INDUSTRIAL PARK DISTRICTS:

"A. PERMITTED USES.

"(1) Any use permitted in RESEARCH, SCIENTIFIC AND PROFESSIONAL DISTRICT except construction and use of dwellings.

"(2) Office Building.

"(3) Research Laboratory.

"(4) Public Utility.

"(5) Printing and Publishing Plant.

"(6) Bottling Plant.

"(7) Wholesale products distribution and storage, excepting transfer business, when in a roofed structure.

"(8) Manufacturing, processing, assembling and packaging of food products, including bakery, confectionery and dairy products, drugs, electronic, communication, optical and scientific instruments and parts, office machines and parts, watches, clocks, small tools and dies, small instrument parts and other similar products of light industry by and after determination by the Board of Appeals at any time that such use is not in conflict with public health, safety, convenience or welfare and is not substantially detrimental or offensive to adjacent or nearby districts or destructive of property values in such districts.

"(9) Dwelling for night watchman or janitor.

"(10) Cafeteria for use by employees only as an accessory use."

mendation on the proposed amendment (four members favoring, one abstaining), the planning board on August 12, 1976, stated in part: "The Planning Board concluded that adoption ... was consistent with the desires of a substantial number of residents and a clear expression of how they wish to regulate the use of land, buildings and structures within the Town." The amendment was considered at a special town meeting held on the evening of August 12, and was approved by a vote of 260 to 65.[4] It consisted of adding to § VIII, 8, of the zoning by-law, as the fifth of the "Prohibited Uses — All Districts," the words "Abortion Clinics," "abortion" being defined in par. 16 added to § II as "the knowing destruction of the life of an unborn child or the intentional expulsion or removal of an unborn child from the womb other than for the principal purposes of producing a live birth."[5] (The other four prohibited uses for all districts were: "Trailer camps," "Commercial race tracks or uses accessory thereto," "Junk yards," and "Piggeries or fur farms.")

The foregoing account has been abstracted from a statement of agreed facts prepared by the parties to the action after complaint and answer were filed. (Additional facts from the same source will be referred to below.) On a

---

[4] See G. L. c. 40A, § 5, regarding the procedures for adoption of an amendment to a zoning by-law, including the requirement of a two-thirds vote of a town meeting.

The Attorney General signified his approval of the by-law amendment under G. L. c. 40, § 32.

[5] The definition of "clinic," carried over from G. L. c. 111, § 52, as appearing in St. 1967, c. 891, § 2, was " 'Clinic', any institution or place however named, conducted for charity or profit, which is advertised, announced, established or maintained under the name of a clinic for the purpose of providing medical, surgical, dental, restorative or mental hygiene services to persons not residing therein. Clinic shall include such places as 'medical associates', 'dispensary', 'medical center', 'medical institute', 'rehabilitation center', 'rehabilitation institute', 'memorial', 'association', or such other designation of like import but not necessarily limited to the above mentioned. It shall not include a clinic conducted by a hospital licensed under section fifty-one, or a clinic conducted under the authority of the United States government, or under the authority of the commonwealth or a local health department. Clinics shall not provide overnight care."

record incorporating the statement, a single justice of this court, without decision, reserved and reported the case for determination by the full bench.[6]

We hold for the plaintiffs. The by-law amendment is invalid. The conclusion becomes clear when attention is paid to the constitutionally protected rights of a woman in respect to termination of her pregnancy (and the correlative rights of an attending physician or a health facility), as expounded by the Supreme Court of the United States in the line of cases beginning with *Roe* v. *Wade*, 410 U.S. 113 (1973).[7] These are rights of "privacy," acknowledged to be "fundamental." *Wade* at 153. *Maher* v. *Roe*, 432 U.S. 464, 471-473 (1977). See also *Carey* v. *Population Servs. Int'l*, 431 U.S. 678, 684-686 (1977). During the first trimester of pregnancy, the rights are at their apogee, enjoying a high measure of freedom from peculiar interposition by the State.[8] It was in this sense that the Supreme Court said in *Wade, supra* at 164: "For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician." The State may evince an intensified interest in the health of the woman only after the first trimester, and in the potentiality of the life of the fetus, only after the fetus attains viability. *Id*. at 164-165.

However, the State is not bereft of all power to regulate the abortion situation, as such, during the first stage. Thus, to help assure that the "abortion decision," surely

---

[6] A number of residents of the town moved collectively to intervene in the action on the side of the defendants under Mass. R. Civ. P. 24, 365 Mass. 769 (1974). The single justice granted the motion.

[7] There is no problem here about the "standing" of a physician or health facility to put forward the rights of patients, as all have been joined as plaintiffs.

[8] We speak of relative freedom from "peculiar" interposition — legislation specially directed to the abortion episode. A physician performing an abortion may be obliged to meet license requirements that apply generally to procedures of like risk or complexity, and a department of public health may assess the need for gynecological facilities as it does for other medical facilities.

an important decision, is well deliberated, the State of Missouri could require that, before undergoing the abortion procedure during the first twelve weeks of a pregnancy, the woman should put her consent in writing and certify that it was informed and freely given and not the result of coercion. *Planned Parenthood* v. *Danforth,* 428 U.S. 52, 65-67 (1976).[9] See *Bellotti* v. *Baird,* 428 U.S. 132, 148-150 (1976). Similarly we may assume there is some room for State regulation directed particularly to the "effectuation" of the abortion decision in the early period. It is not easy to find a precise answer to the question what burden a State must sustain in order to establish the validity of a regulation impinging on the constitutional right during that time span — whether the State must demonstrate a "compelling" interest overcoming the right pro tanto, or whether, in some circumstances at any rate, a less rigorous showing may suffice. Compare Powell, J., in *Maher* v. *Roe, supra* at 471-473, with Brennan, J., dissenting, *id.* at 483-485. We may forgo a nice analysis here because the facts do not place the case at a borderline of invalidity but well beyond it; the regulation appears on its face to be an incursion into the basic right without acceptable justification.

The by-law amendment would have the effect of banishing from the town any clinic in which first-trimester abortions, themselves admittedly lawful, were performed.[10] But clinics offering other lawful medical procedures could locate themselves and carry on in this or any other indus-

---

[9] On the other hand, the State could not require the consent of the woman's spouse or, if she were an unmarried minor, of her parents, as a condition of the legality of an abortion to be performed upon her during the same initial period of the pregnancy: that would be an undue interference with the fundamental right. *Planned Parenthood* v. *Danforth,* 428 U.S. at 67-75. See *Doe* v. *Doe,* 365 Mass. 556 (1974). Whether the Court will hold parental "consultation" to be distinguishable from "consent" remains to be seen. See *Bellotti* v. *Baird,* 428 U.S. 132, 147-148 (1976); *Baird* v. *Attorney Gen.,* 371 Mass. 741, 746-755 (1977).

[10] It is perhaps worth observing that where, as in the plaintiffs' proposed clinic, comprehensive family planning is sponsored, the tendency will be to obviate the need for abortions through the recommendation of measures to avoid undesired conception.

trial park district that might appear on the town map. This indicates strongly that discrimination was at work against the constitutional right. The exiling of clinics performing the abortion procedure would confine recourse in the town for that remedy to hospitals or individual physicians who might offer it. But that would burden arbitrarily the constitutional right. It may make the point more sharply, perhaps, to note that the legal vices would be in substance the same, had the regulation taken the more obviously grotesque form of "zoning out" of the town the private offices of any physicians who proposed to perform lawful first-trimester abortions there.

Similar elements of unjustified discrimination against, and undue burdening of, the constitutional right were present in State regulations that have been invalidated by the courts as repugnant to the pattern contemplated by *Roe* v. *Wade*.[11] In *Doe* v. *Bolton*, 410 U.S. 179 (1973), a companion case to *Wade*, the Court held that Georgia could not require that first-trimester abortions be carried out in hospitals (as distinguished from other places sufficiently equipped). Nor that hospitals at which abortions were performed should hold accreditation from the Joint Commission on Accreditation of Hospitals, when that requirement was not imposed on hospitals at which other medical procedures occurred indistinguishable as to risk. Nor that a hospital staff committee on abortion should pass on the propriety of abortions already found appropriate by the attending physician. Nor that the physician's judgment should be concurred in by two other physicians upon their separate personal examinations of the patient. These attempted intrusions by the State by extra layers of regulation were perhaps less questionable than the one at bar, but they fell nevertheless. By reasoning as in the *Bolton* case, a number of State and local regulations have been voided which varied in their details but suffered from

---

[11] For analytic purposes it does not seem to make a difference whether these grounds of invalidity are related to due process or equal protection. Cf. *Hathaway* v. *Worcester City Hosp.*, 475 F.2d 701, 706 n.5 (1st Cir. 1973).

the same basic constitutional defects. See, e.g., *Hodgson* v. *Lawson*, 542 F.2d 1350 (8th Cir. 1976) (sundry regulations of abortion procedure);[12] *Word* v. *Poelker*, 495 F.2d 1349 (8th Cir. 1974) (regulation of "abortion clinics"); *Friendship Medical Center, Ltd.* v. *Chicago Bd. of Health*, 505 F.2d 1141 (7th Cir. 1974), cert. denied, 420 U.S. 997 (1975) (extensive regulation of facilities, personnel, etc.); *Arnold* v. *Sendak*, 416 F. Supp. 22 (S.D. Ind.) (three-judge court), summarily aff'd, 429 U.S. 968 (1976) (requirement of hospital or certain licensed facilities for first-trimester procedures); *Hallmark Clinic* v. *North Carolina Dep't of Human Resources*, 380 F. Supp. 1153 (E.D.N.C. 1974) (three-judge court) (aff'd on an unrelated point, 519 F.2d 1315 [4th Cir. 1975]) (detailed regulation of clinics performing first-trimester abortions). See also *Planned Parenthood Ass'n* v. *Fitzpatrick*, 401 F. Supp. 554 (E.D. Pa. 1975) (three-judge court); *Wolfe* v. *Schroering*, 388 F. Supp. 631 (W.D. Ky. 1974) (three-judge court). In the case of *Planned Parenthood* v. *St. Paul*, No. 3-76-Civ. 230 (D. Minn., July 19, 1976),* we find an official regulation which, like Southborough's by-law amendment, was directed to the physical plant. The city of St. Paul adopted a resolution imposing a moratorium on the construction, adaptation, or modification of separate abortion facilities (as defined). At the suit of a private medical provider intending to renovate a location in the city at which it proposed to offer first-trimester abortions, the District Court granted a preliminary injunction against enforcement of the resolution: there was no apparent justification for this singling out of abortion-related facilities. It was not an answer that the regulation was exercising a zoning power, for it has been clear since *Buchanan* v. *Warley*, 245 U.S. 60 (1917), that such a law may be so framed as to offend against protected freedoms. See *Moore* v. *East Cleveland*, 431 U.S. 494 (1977).

---

[12] For the prior history, see *Hodgson* v. *Anderson*, 378 F. Supp. 1008 (D. Minn. 1974) (three-judge court), app. dismissed sub nom. *Spannaus* v. *Hodgson*, 420 U.S. 903 (1975).

* Affirmed (except for a ruling on a motion to intervene) sub nom. *Planned Parenthood of Minnesota, Inc.* v. *Citizens for Community Action*, 558 F.2d 861 (8th Cir. 1977). — REPORTER.

The Southborough regulation, then, is a serious abridgment of constitutional rights. The desires of members of the community to disfavor an "abortion clinic" — desires which, reflexively, may cause these persons to see an economic detriment to themselves in the existence of the clinic — cannot extenuate such a violation. The report of the Southborough planning board about public sentiment was thus an irrelevancy, and a dangerous one, for that way would lie the extinction of many liberties which are, indeed, constitutionally guaranteed against invasion by a majority. Insupportable also was a suggestion emerging during the discussion at the Southborough town meeting that it might serve to improve the legality of the by-law amendment that the particular clinic was not "free" but was to be operated as a business. See *Hallmark Clinic, supra* at 1155.[13]

Neither could Southborough justify its own exclusionary rule by saying that a woman might overcome it by going elsewhere in the Commonwealth. May a "fundamental" right be denied in Worcester County because it remains available in Suffolk or Barnstable? Such a proposition cannot be seriously maintained. Cf. *Rodos* v. *Michaelson*, 527 F.2d 582, 585, n.5 (1st Cir. 1975). The picture of one community attempting thus to throw off on others would not be a happy one.[14]

No argument de minimis has been attempted, such as that any constitutional infringement involved was unworthy of note because a similar facility existed in the same neighborhood — say on the other side of Route 9, in Framingham. Cf. *Doe* v. *Hale Hosp.*, 500 F.2d 144, 146 (1st Cir. 1974). We need not declare how we would regard such a contention (unlikely to arise in the present context

---

[13] *Young* v. *American Mini Theatres, Inc.*, 427 U.S. 50 (1976), upholding a zoning ordinance applicable to "adult theatres," is not analogous to the present case. It will be enough to say that there is nothing here comparable to the deterioration of neighborhoods manifested in the *Young* case, and *Young* itself looked to a locational distribution of the theatres within the city, not a banishment from it.

[14] Already the newspapers have reported the beginning of an attempt by another community in Massachusetts to follow the example of Southborough.

because of the State determination-of-need policy). In fact the record reveals that to reach a clinic affording first-trimester terminations on an out-patient basis a woman would have to travel to Boston, Brighton, Brookline, or Springfield.

Finally, the defendants may not take comfort from the recent decisions of the Supreme Court holding that a State is not constitutionally required affirmatively to finance (as through Medicaid), or otherwise affirmatively to make provision for nontherapeutic abortions, even if it chooses to take such supportive action with respect to pregnancies carried to term. *Maher* v. *Roe, supra. Poelker* v. *Doe*, 432 U.S. 519 (1977). Cf. *Beal* v. *Doe*, 432 U.S. 438 (1977). As the Court indicated expressly, see *Maher*, 432 U.S. at 475-476, this leaves intact the principle of *Roe* v. *Wade* which, as described above, forbids the State to interpose material obstacles to the effectuation of a woman's counselled decision to terminate her pregnancy during the first trimester. Indeed, the need for scrupulous observance of this neutral or negative constitutional principle is felt all the more strongly as the State is seen to have no affirmative duty.[15]

The case will be remitted to the single justice for the entry of an appropriate judgment for the plaintiffs.

*So ordered.*

HENNESSEY, C.J. (concurring, with whom Quirico, J., joins). I concur with the result reached in the main opinion; the by-law amendment is invalid. I do not join in the reasoning of the main opinion. In my view it is not necessary here to apply the principles of *Roe* v. *Wade* and related cases. This court should adhere to the important maxim that it reaches constitutional challenges only when it is necessary to do so. It is not necessary here. I would

---

[15] It would be possible to say that the constitutionality of the by-law amendment is so dubious, at best, that § 3 of the statute (St. 1975, c. 808) which sets out the permissible zoning purposes of local governmental units under The Zoning Act, G. L. c. 40A, should be construed not to contemplate a power in a town to enact a regulation of that type. In the circumstances, however, it is hard to see any analytical or practical advantage in so thin an "avoidance" of the constitutional question.

hold that this by-law amendment is not valid as a matter of statutory construction.

I would hold that the authority to regulate specific requirements for health facilities, including the location of such facilities, has been delegated by the Legislature to the Department of Public Health. G. L. c. 111, §§ 25C, 51, 51A. The local by-law is not controlling since it conflicts with the scheme of the general law. See *Bloom* v. *Worcester,* 363 Mass. 136, 149 (1973). Cf. *New England LNG Co.* v. *Fall River,* 368 Mass. 259, 267 (1975). This is true because, although the Department of Public Health was in the process of approving the facility, the effect of the by-law is to exclude such clinics altogether; there would be no conflict, of course, if the by-law imposed reasonable regulation as to location within the town.

Further, I would hold that the by-law cannot be upheld within the meaning of the enabling zoning statutes, G. L. c. 40A, §§ 2, 3. It is true that every presumption will be made in favor of a zoning amendment unless it is shown beyond a reasonable doubt to conflict with the enabling act. *Lanner* v. *Board of Appeal of Tewksbury,* 348 Mass. 220, 228 (1964). *Aronson* v. *Sharon,* 346 Mass. 598, 603 (1964). Nevertheless, the by-law here does not pass muster under the statutes. The by-law would permit all medical clinics except abortion clinics to operate in the area zoned for industrial uses. Under the enabling statutes, there is no "rational basis" for such a restriction (see *Pierce* v. *Wellesley,* 336 Mass. 517, 524 [1957]) and the by-law has no real or substantial relation to the statutory criteria. *Jenckes* v. *Building Comm'r of Brookline,* 341 Mass. 162, 166 (1960). *Gem Properties, Inc.* v. *Board of Appeals of Milton,* 341 Mass. 99, 105 (1960). *Barney & Carey Co.* v. *Milton,* 324 Mass. 440, 445 (1949). I would reach the same result, by applying the statutory criteria, if the by-law attempted to exclude, for example, only orthopedic clinics or only diabetes clinics. In my view, this statutory approach would, to say the least, be of greater value as precedent in treating future analogous cases than the constitutional approach unnecessarily adopted in the main opinion.