MARY MOE & others[1] *vs.* SECRETARY OF ADMINISTRATION
AND FINANCE & others.[2]

Suffolk.  September 8, 1980. — February 18, 1981.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Abortion. Massachusetts Medical Assistance Program. Practice, Civil,*
Declarative relief. *Jurisdiction,* Political question. *Constitutional*
*Law,* Abortion, Separation of powers, Appropriation of money, Equal
protection of laws, Separable portion of statute. *Due Process of Law,*
Abortion.

Judicial resolution of a controversy with respect to certain statutory pro-
visions restricting the funding of abortions under the Massachusetts

[1] The names of the plaintiffs as stated in the complaint are Mary Moe,
Karen Koe, Paula Poe, and Dr. Phillip Stubblefield.  The first three
names, which are clearly pseudonyms, appear elsewhere in the pleadings
and related documents, and particularly in affidavits purporting to have
been executed by them.  The record before us includes a motion filed by
counsel for those plaintiffs asking that those three persons be permitted to
proceed without disclosing their true names for reasons related to the
possible serious impact on their lives and the lives of family members.  The
motion has not been acted on.  We believe that it is important and
necessary that the identity of the persons who seek the benefit of a judg-
ment by this court appear in the records of this proceeding.  While we
recognize the reasons stated by these persons as sufficient to protect them
against the public disclosure of their identity, we deny their motion and
order that each of the three plaintiffs in question file an affidavit of identi-
ty with the clerk of the Supreme Judicial Court for Suffolk County, and
that such affidavit, when filed, be impounded until further order of the
court.

[2] The defendants originally named in the complaint were each of the
persons then holding the following offices or positions with the Com-
monwealth of Massachusetts:  Governor, Secretary of Administration and
Finance, Secretary of Human Services, Commissioner of Public Welfare,
and Comptroller.  By an order entered by the single justice on July 23,
1980, the action was dismissed as to the Governor for the reason that he
had been improperly joined as a defendant.

We take note of the fact that the individual defendant described in the
complaint as "John D. Pratt [as he] is the Commissioner of Public Wel-

Medical Assistance Program would not violate either the principle of separation of powers or the political question doctrine; nor were the provisions immunized against judicial review merely because they involved an exercise of the appropriations power. [641-642]

In an action by a class of pregnant women eligible for assistance under the Massachusetts Medical Assistance Program and a class of qualified Medicaid providers challenging certain statutory provisions restricting the funding of abortions under the Medicaid program, there was no merit to the defendants' contention that, because the ultimate relief sought was reimbursement to Medicaid providers for abortion services rendered to recipients, it would be premature to resolve the issue of the validity of the statutory provisions until reimbursement was actually withheld; allegations that the challenged restriction would prevent the class of pregnant women from obtaining abortions were sufficient to present an actual controversy appropriate for a declaration of rights. [642-644]

Although the Massachusetts limitation on funding for abortions under the Massachusetts Medical Assistance Program during the fiscal year 1980 was more restrictive than the corresponding Federal legislation and the State legislation would thus have been rendered invalid to the extent of the inconsistency, that statutory conflict was abrogated as to the fiscal year 1981 restriction by Pub. L. 96-536, § 109, 94 Stat. 3170 (1980), enacted December 16, 1980, which gave States the freedom not to fund abortions to the extent that they in their sole discretion deem appropriate. [644-645]

Discussion of the scope of a woman's constitutional right to decide whether or not to terminate a pregnancy by abortion. [645-651]

The Massachusetts Declaration of Rights affords a greater degree of protection to a woman's right to decide whether or not to terminate a pregnancy by abortion than does the Federal Constitution as interpreted by *Harris* v. *McRae,* 448 U.S. 297 (1980). [651]

A statutory restriction on the funding of abortions under the Massachusetts Medical Assistance Program, which limited such funding to cases in which the procedure was necessary to prevent a woman's death, to the exclusion of other lawful, medically necessary abortions, impermissibly burdened a woman's right to decide whether or not to terminate a pregnancy by abortion in violation of the right to due process of law as guaranteed by the Massachusetts Declaration of Rights. [651-659] HENNESSEY, C.J., dissenting.

Where a statutory restriction on the funding of abortions under the Massachusetts Medical Assistance Program was invalid so far as it pro-

---

fare" no longer holds that office, and that William Hogan who has been appointed "his successor is automatically substituted as a party." Mass. R. Civ. P. 25 (d) (1), 365 Mass. 771 (1974).

hibited the use of State Medicaid funds to reimburse authorized providers for lawful, medically necessary abortion services to qualified recipients, this court invalidated the restriction in so far as it was constitutionally offensive rather than nullifying the Medicaid appropriation in its entirety. [659-660]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on July 9, 1980.

The case was reported by *Kaplan, J.*

*Nancy Gertner (John Reinstein, Marjorie Heins & Katherine Triantafillou* with her) for the plaintiffs.

*Thomas R. Kiley,* Assistant Attorney General (*Garrick F. Cole,* Assistant Attorney General, with him) for the defendants.

*Jeanne Barkin,* for Preterm, Inc., amicus curiae, submitted a brief.

*Robert A. Destro,* for Catholic League for Religious and Civil Rights, amicus curiae, submitted a brief.

*Carolynn Fischel & Rita J. DiGiovanni,* for various religious professors & others, amici curiae, submitted a brief.

*John H. Henn, Eve W. Paul & Dara Klassel,* for Planned Parenthood Federation of America, Inc., & others, amici curiae, submitted a brief.

*Kimberly Homan & Joyce Perkit Zalkind,* for Boston Women's Health Book Collective, Inc., & others, amici curiae, submitted a brief.

*Charles Kindregan, Dennis J. Horan, Victor G. Rosenblum, John D. Gorby, Patrick A. Trueman & Thomas J. Marzen,* for certain Massachusetts physicians, amici curiae, submitted a brief.

*Henry C. Luthin,* for certain members of the General Court, and for Massachusetts Citizens for Life, Inc., amici curiae, submitted briefs.

*Terry Jean Seligmann, Margot Botsford & Susanne C. Howard,* for Women's Bar Association of Massachusetts & others, amici curiae, submitted a brief.

QUIRICO, J.   In this class action, the plaintiffs seek to have declared invalid and to enjoin the enforcement of certain statutory provisions restricting the funding of abortions under the Massachusetts Medical Assistance Program (Medicaid).   The defendants are all officials in the executive branch of the government of the Commonwealth.   The challenged enactments include G. L. c. 29, § 20B, inserted by St. 1979, c. 268, § 1, and various appropriation measures including St. 1979, c. 393, § 2, Item 4402-5000, and St. 1980, c. 329, § 2, Item 4402-5000.[3]   These statutes, which by reason of their original legislative sponsors are commonly referred to as the Doyle-Flynn Amendments, would prohibit the payment of State Medicaid funds for abortions except as necessary to avert the death of the mother.   This restriction, it is claimed, violates two provisions of the Massachusetts Declaration of Rights, namely, the provision for equal protection of the laws, art. 1, as amended by art. 106 (Equal Rights Amendment), and

---

[3] General Laws c. 29, § 20B, inserted by St. 1979, c. 268, § 1, provides in full as follows:   "No account or demand approved by the head of a department, office, commission or institution for which it was contracted, requiring the certification of the comptroller or warrant of the governor shall be paid from an appropriation for an abortion, as defined in section twelve K of chapter one hundred and twelve except for an abortion where the attending physician has certified in writing that the abortion is necessary to prevent the death of the mother."

Similar restrictions were first placed on the Commonwealth's Medicaid appropriations by St. 1978, c. 367, § 2, Item 4402-5000, which provided in so far as is here pertinent, "that no funds appropriated under this item shall be expended for the payment of abortions not necessary to prevent the death of the mother.   This provision does not prohibit payment for medical procedures necessary for the prompt treatment of the victims of forced rape or incest if such rape or incest is reported to a licensed hospital or law enforcement agency within thirty days after said incident."

The appropriations for fiscal year 1980, St. 1979, c. 393, § 2, Item 4402-5000, eliminated the exception for rape and incest present in the 1978 appropriations; it provided "that no funds appropriated under this item shall be expended for the payment of abortions not necessary to prevent the death of the mother."   The relevant language of the most recent Appropriations Act, St.1980, c. 329, § 2, Item 4402-5000, is identical.

art. 10 as it relates to the right to due process of law.[4]  For
reasons which follow, we decide in favor of the plaintiffs.

I.  *The background of this action.*  The Medicaid pro-
gram is one of the several joint Federal-State programs of
assistance to the indigent included in the Social Security
Act, 42 U.S.C. § 301 et seq. (1976 & Supp. III 1979) (Act).
By enacting Title XIX of the Act, 42 U.S.C. §§ 1396-1396k
(1976 & Supp. III 1979), Congress in 1965 authorized the
expenditure of Federal funds to enable each State to furnish
medical assistance to certain categories of needy persons.
Participation is at the option of each State, and the States are
free within broad parameters to determine the scope and ex-
tent of the assistance offered.  Certain minimum require-
ments must be met, however, to qualify for Federal aid.  A
State must furnish five types of services[5] to the "categorically
needy."[6]  A State may also furnish assistance, subject to cer-
tain restrictions, to persons who are not categorically needy,
but who nonetheless have insufficient income and resources
to meet the costs of necessary medical and remedial care and
services.  See 42 U.S.C. § 1396a(a)(10)(C).[7]  The Federal
legislation does not specifically enumerate the services
which the States must offer within the mandated categories

---

[4] We have historically taken the view that the principles of due process
of law in our State Constitution are embodied in arts. 1, 10, and 12 of the
Declaration of Rights and in Part II, c. 1, of the Constitution.  See, e.g.,
Wilkins, Judicial Treatment of the Massachusetts Declaration of Rights in
Relation to Cognate Provisions of the United States Constitution, 14 Suf-
folk U.L. Rev. 887, 909-910 n.135 (1980).

[5] These services include (1) inpatient hospital services; (2) outpatient
hospital services; (3) other laboratory and X-ray services; (4) skilled nurs-
ing services, early periodic screening and diagnosis, and family planning
services, and (5) physicians' services.  See 42 U.S.C. § 1396a(a)(13)(B)
and 42 U.S.C. § 1396d(a)(1)-(5).

[6] The "categorically needy" include the aged, blind, or disabled, and
recipients of either supplemental security income or aid for dependent
children.  42 U.S.C. § 1396a(a)(13)(B).

[7] An overview of the provisions of Title XIX may be found at 3
Medicare & Medicaid Guide (CCH) par. 14,010, from which our sum-
mary is in part derived.

of care and services. It does, however, require participating States to establish reasonable standards governing the extent of such services consistent with statutory purposes. See *Beal* v. *Doe*, 432 U.S. 438, 441 (1977), citing 42 U.S.C. § 1396a(a)(17). It is settled as a matter of Federal law that Medicaid-participant States remain free to subsidize at their own expense abortions beyond those for which Federal reimbursement is available. See *Harris* v. *McRae*, 448 U.S. 297, 311 n.16 (1980). Thus, the relief sought here would not jeopardize Federal reimbursement for other services provided by the Massachusetts Medicaid program.

Massachusetts joined the national Medical Assistance Program in 1966, by Executive Order of the Governor. The Legislature established the Massachusetts Medical Assistance Program in 1969; the program is codified in G. L. c. 118E, §§ 1-27. The major responsibility for policy making and administration is lodged in the Department of Public Welfare. G. L. c. 118E, §§ 2, 4. The current administrative and billing regulations are contained in 106 Code Mass. Regs. 450.000 et seq., as amended, 185 Mass. Reg. 9 (November 23, 1979).

The Massachusetts program is broad and comprehensive. For eight categories of recipients, the program affords twenty-nine types of services; a more limited range of services, numbering ten, is available under the State's General Relief Medical Assistance Program. See 106 Code Mass. Regs. 450.105 and 107. These services are all provided subject to the standard of "medical necessity" set forth at 106 Code Mass. Regs. 450.204, as follows: "A provider must furnish or prescribe medical services to the recipient only when, and to the extent, medically necessary, unless otherwise specified in Department regulations. For the purposes of this Chapter 450.000, a service is 'medically necessary' if it is (1) reasonably calculated to prevent, diagnose, prevent the worsening of, alleviate, correct, or cure conditions in the recipient that endanger life, cause suffering or pain, cause physical deformity or malfunction, threaten to cause

or to aggravate a handicap, or result in illness or infirmity; and (2) there is no other equally effective course of treatment available or suitable for the recipient requesting the service that is more conservative or substantially less costly. Medical services shall be of a quality that meets professionally recognized standards of health care, and shall be substantiated by records including evidence of such medical necessity and quality. Those records shall be made available to the Department upon request. (See 42 U.S.C. 1396a(a)(30), and 42 CFR 440.230(C)(2) and 440.260.)"

An understanding of the plaintiffs' objectives in this case requires some knowledge of the history of Medicaid funding for abortion in Massachusetts. Following the decision of the United States Supreme Court in *Roe* v. *Wade*, 410 U.S. 113 (1973), the State issued regulations establishing abortion coverage coextensive with the limits on State regulation set [forth] in that decision.[8]

The first Federal restrictions on Medicaid funding for abortions came in 1976. In that year, Congress enacted the so called "Hyde Amendment," a rider to the Labor-HEW Appropriations Act limiting Federal reimbursement of abortion services to cases in which "the life of the mother would be endangered if the fetus were carried to term." Pub. L. No. 94-439, § 209, 90 Stat. 1434 (1976). Similar restrictions were passed by Congress in 1977, 1978, and 1979.[9] Notwithstanding the elimination of Federal reim-

---

[8] The introduction to the 1974 regulations, Massachusetts Public Assistance Policy Manual c. 7, § 10, part 1 (effective October 1, 1974), stated that "[a] woman always has the freedom of choice regarding abortion, just as she has freedom of choice with regard to any other medical service." First trimester abortions were required to be performed by a licensed and qualified physician in a licensed clinic or in a hospital. The performance of second trimester abortions was permitted only in hospitals. Funding for third trimester abortions was limited to those necessary to save the life of a woman or "to eliminate substantial risk of grave impairment to her physical or mental health." Massachusetts Public Assistance Policy Manual, *supra* at 1-2.

[9] The 1977 version, covering fiscal year 1978, was slightly broader than the 1976 version in that it included two additional categories, cases of

bursement for all but this limited category of abortions, Massachusetts continued until 1978 to fund abortion services under its medicaid program as before.

On July 10, 1978, the General Court first acted to limit State Medicaid expenditures for abortion. The restriction was in a form similar to the Hyde Amendment; a rider to the State's Medicaid appropriations for fiscal year 1979, St. 1978, c. 367, § 2, Item 4402-5000, prohibited State reimbursement for abortions except when necessary to prevent the death of the pregnant woman or in certain cases of rape or incest. Chapter 367 was immediately challenged in an action filed in the United States District Court for the District of Massachusetts. The plaintiffs alleged that the State's failure to provide for "medically necessary" abortions violated Title XIX and the United States Constitution. That court, while agreeing that c. 367, § 2, Item 4402-5000, violated the requirements of Title XIX, declined to order the State to pay for abortions other than those which would qualify for Federal reimbursement under the Hyde Amendment. *Jaffe* v. *Sharp*, 463 F. Supp. 222 (D. Mass 1978). The plaintiffs appealed, and on August 7, 1978, an order was entered by the United States Court of Appeals for the First Circuit requiring the Commonwealth to fund all medically necessary abortions pending disposition of the appeal. On January 15, 1979, the First Circuit affirmed the District Court's statutory ruling, holding that the Hyde Amendment had amended Title XIX and that the State was thus not statutorily required to fund abortions beyond those

---

"severe and long-lasting physical health damage" and "rape or incest." Pub. L. No. 95-205, § 101, 91 Stat. 1460 (1977). The 1978 version (for fiscal year 1979) was identical to 1977. Pub L. No. 95-480, § 210, 92 Stat. 1586 (1978). In 1979, Congress eliminated the "severe and long-lasting physical health damage" exception. Pub. L. No. 96-123, § 109, 93 Stat. 926 (1979). The latest Federal legislation limits reimbursement for abortion to cases in which continued pregnancy is life-endangering, to cases of ectopic pregnancy, and to certain cases involving rape or incest; participating States are left free, however, to further restrict abortion subsidies in their sole discretion. Pub. L. No. 96-536, § 109, 94 Stat. 3170 (1980).

eligible for Federal reimbursement. *Preterm, Inc.* v. *Dukakis,* 591 F.2d 121 (1st Cir. 1979). The Court of Appeals remanded the case to the District Court for consideration of the plaintiffs' constitutional claims, but continued its order enjoining the enforcement of the funding restriction then in effect, pending a ruling on the plaintiffs' petition for a writ of certiorari. Certiorari was denied on May 14, 1979, sub nom. *Preterm, Inc.* v. *King,* 441 U.S. 952 (1979). A petition for rehearing was denied on October 1, 1979, 444 U.S. 888 (1979).

Between October 1, 1979, and January 15, 1980, although not bound by any court order, the Commonwealth chose not to implement any funding restriction and paid for all medically necessary abortions. During this interim, the United States District Court for the Eastern District of New York held the restriction placed on Federal reimbursement for abortions by the Hyde Amendment to be unconstitutional and entered an order effective January 15, 1980, enjoining the Secretary of Health, Education and Welfare from discontinuing Federal reimbursement for medically necessary abortions. *McRae* v. *Califano,* 491 F. Supp 630 (E.D.N.Y. 1980). Since the First Circuit had already held the Doyle-Flynn Amendment to be in conflict with Title XIX, the order in *McRae* had the apparent effect of requiring Medicaid coverage for medically necessary abortions, and the Commonwealth continued to provide such coverage. On June 30, 1980, however, the United States Supreme Court reversed the Federal District Court's decision in *McRae,* holding that Title XIX does not require State Medicaid programs to fund abortion services for which Federal reimbursement is unavailable and upholding the validity of the Hyde Amendment against a variety of constitutional challenges. *Harris* v. *McRae,* 448 U.S. 297 (1980).

The upshot of this long course of litigation is that before the June 30, 1980, decision in *Harris* v. *McRae, supra,* Massachusetts had never refused to reimburse Medicaid pro-

viders who had performed medically necessary abortions. Following that decision, however, the Commonwealth made known its intention to implement the provision of St. 1980, c. 329, § 2, Item 4402-5000, restricting State reimbursement for Medicaid abortions to those cases in which the procedure is necessary to prevent the death of the mother.   On July 9, 1980, this action was filed in the Supreme Judicial Court for Suffolk County.

We summarize the facts alleged by the plaintiffs in their complaint and in the affidavits which accompanied their motion for a temporary restraining order, filed simultaneously with the complaint.   Each of the three pseudonymous plaintiffs representing the class of Medicaid-eligible pregnant women alleges similar facts.   Each is pregnant and is eligible for Medicaid assistance.   Each has decided after consultation with her physician that she wishes to terminate her pregnancy by abortion.   In each case, the consulting physician believes that an abortion is medically indicated, but cannot certify that the procedure is necessary to prevent death.   None of the three could afford to have an abortion without Medicaid assistance.

Dr. Phillip Stubblefield, the fourth named plaintiff, is a physician licensed to practice in Massachusetts; his specialty is obstetrics and gynecology.   He is an authorized Medicaid provider whose practice includes performing abortions and supervising the abortion service in a Boston hospital.   He brings this action on his own behalf and on behalf of a class consisting of qualified Medicaid providers who are willing to perform abortions which cannot be characterized as necessary to prevent death.   He describes the various procedures used to perform abortions, and the considerations, relating primarily to the stage of pregnancy, which determine which procedure is appropriate.   He cites statistics tending to demonstrate that the risks to health associated with abortion increase as a pregnancy progresses, and states that postponing an abortion unnecessarily is wholly inconsistent with sound medical practice.   Dr. Stubblefield lists a number of medical conditions which, in conjunction with

pregnancy, pose a risk to health and which may in their more severe forms be life-threatening.[10] Because the risks associated with these conditions typically increase as a pregnancy becomes more advanced, Dr. Stubblefield suggests that physicians treating Medicaid-eligible pregnant women under the constraints of the challenged restriction face a dilemma: They may be forced to refuse treatment involving abortion early in a woman's pregnancy, only to undertake a more complicated and dangerous operation at some later stage when the situation has become life-threatening. He further cites a number of conditions in which termination of pregnancy is the preferred treatment, although not necessary to avert death.[11] In sum, Dr. Stubblefield concludes that a "standard of medical care which considers only the certainty [or] likelihood of a patient's death is alien and antithetical to medicine in general. I know of no area of medical practice in which a physician exercises professional responsibility solely in terms of life and death assessments." Dr. Stubblefield thus alleges that the constraints imposed by these restrictions on the free exercise of a physician's medical judgment violate the equal protection guarantee of the Massachusetts Declaration of Rights.

The defendants answered on July 16, 1980, asserting in the form of affirmative defenses a number of alleged pro-

---

[10] Dr. Stubblefield cites the following conditions as illustrative: "chronic lung disease (childbirth accelerates the deterioration of the lung function); essential hypertension (pregnancy may increase the likelihood of pre-eclampsia or eclampsia, complications of pregnancy characterized by significant protein loss in the urine and edema, which in turn accelerates the likelihood of vascular disease and the risk of a cerebral-vascular accident, of brain vessel and kidney damage, and increased incidence of diabetes); diabetes; heart disease (particularly mitral stenosis — the most common cardiac complication associated with pregnancy); and renal (kidney) disease particularly chronic nephritis and pyelo-nephritis; pregnancy can contribute to renal failure."

[11] According to Dr. Stubblefield, abortion is recommended without regard to the patient's wish in cases involving a severe diabetic retinopathy, which may cause blindness in a pregnant woman; certain genital and other cancers; and habituation or addiction to alcohol or other drugs.

cedural or jurisdictional defects in the action, and denying the plaintiffs' substantive claims. In the interim between the answer and the hearing before the single justice, the defendants moved to require posting of a bond by the plaintiffs should the preliminary order sought by the plaintiffs be granted; they further moved for disclosure of the pseudonymous plaintiffs' names, moved to compel those plaintiffs to submit to physical and mental examinations, and noticed depositions with each of the plaintiffs.

After hearing counsel, the single justice on July 23, 1980, entered an order provisionally certifying two plaintiff classes, dismissing the action against the Governor on the ground that he had been improperly joined, and granting a preliminary injunction against taking any action to enforce the challenged statutes in so far as they would prohibit the funding of medically necessary abortions for Medicaid recipients.[12] The single justice further reserved decision on and reported to the full court a number of procedural and jurisdictional issues, as well as the plaintiffs' central constitutional claims.[13]

---

[12] The plaintiff classes provisionally certified by the single justice were as follows: "(a) Medicaid-eligible pregnant women who desire abortions and whose physicians have determined that abortion is medically necessary, even though not necessary to avert their death; and (b) Physicians who are willing to perform abortions in the circumstances indicated in (a) above." The single justice expressly denied relief as to nontherapeutic abortions and limited his order enjoining enforcement of the funding restrictions to cases involving medically necessary abortions.

We agree with the distinction drawn by the single justice between nontherapeutic and medically necessary abortions. The Massachusetts Medicaid program establishes a single standard of medical necessity, and funds no service which does not meet that standard. See 106 Code Mass. Regs. 450.204, as amended, 185 Mass. Reg. 9 (November 23, 1979). Because there is no entitlement under the Massachusetts plan to "elective" services which are not also medically necessary, the exclusion of funding for abortions which fall into that category presents no constitutional issue. See *Maher* v. *Roe*, 432 U.S. 464, 479 (1977); *Right to Choose* v. *Byrne*, 165 N.J. Super. 443, 455 (1979).

[13] The order of July 23 was superseded by a substantially identical order entered by the single justice on August 1, 1980, which continued temporary relief pending argument of this case to the full court.

Since the entry of the July 23 order, the defendants have amended their answer to include a counterclaim for payments received by Medicaid providers pursuant to that order. The parties have also entered into three stipulations. The plaintiffs have restated their claims; essentially, they seek Medicaid coverage for abortions coextensive with the legal limits in force in the Commonwealth. See G. L. c. 112, §§ 12K-12U. But see note 12, *supra*. The defendants have agreed to continue their previously noticed depositions of the pseudonymous plaintiffs pending our disposition of the case. Finally, in a statement of agreed facts, the parties agree that certain documents submitted in a separate record appendix are genuine, and that "[n]o other service within the scope of the Massachusetts Medical Assistance Program . . . is subject to the restrictions which the General Court has imposed upon abortion services."

II. *Threshold considerations.* We consider at the outset three potential grounds for avoiding the constitutional issues argued by the plaintiffs. The defendants advance two reasons for refusing to adjudicate this case at present. They argue, first, that this court lacks subject matter jurisdiction over this action; and second, that the relief sought by the plaintiffs is barred by the existence of an adequate remedy at law. We reach the third ground, namely a possible conflict between State and Federal standards for Medicaid eligibility, in deference to our obligation to avoid constitutional adjudication if any other ground of decision appears sufficient to dispose of a particular case. We therefore discuss the possibility that this case may be decided on statutory grounds.

A. *Jurisdiction.* The defendants assert that this court lacks subject matter jurisdiction of this case both because granting relief would violate the principle of separation of powers expressed in art. 30 of the Massachusetts Declaration of Rights, and because this case involves a political question. The basis for their position is that the challenged enactments are, in part, appropriations measures, and the power to appropriate funds is committed to the Legislature.

See *Opinion of the Justices*, 375 Mass. 827, 833 (1978); *Baker* v. *Commonwealth*, 312 Mass. 490, 493 (1942). Accordingly, they argue that fashioning relief in this case will involve a forced appropriation, an intrusion into the legislative sphere purportedly beyond the constitutional power of this court.

There are two answers to the concerns expressed by the defendants. First, the plaintiffs do not seek any forced appropriation of funds. Here, the Legislature has already exercised its unquestioned power to appropriate funds. The appropriation is general in form; the sole restriction pertaining to the coverage of medical services is the abortion funding provision challenged here. See St. 1980, c. 329, § 2, Item 4402-5000. If we were to grant the relief the plaintiffs seek, it is undisputed that the net effect would be to reduce the Commonwealth's Medicaid expenditures, not increase them. See note 20, *infra*.

More fundamentally, we have never embraced the proposition that merely because a legislative action involves an exercise of the appropriations power, it is on that account immunized against judicial review. In *Colo* v. *Treasurer & Receiver Gen.*, 378 Mass. 550, 552-553 (1979), we rejected the argument that either the doctrine of separation of powers or the political question doctrine requires that result. "Without in any way attempting to invade the rightful province of the Legislature to conduct its own business, we have the duty, certainly since *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 178 (1803), to adjudicate a claim that a law and the actions undertaken pursuant to that law conflict with the requirements of the Constitution. 'This,' in the words of Mr. Chief Justice Marshall, 'is of the very essence of judicial duty.'" *Colo, supra* at 553. Clearly, the relief sought by the plaintiffs is within our power to grant. As to the form that relief should take, we think that question more appropriately addressed at the end of this opinion.

B. *Adequacy of the remedy provided by G. L. c. 258, §§ 1-13.* The defendants further take the position that

because the "ultimate relief" sought here is reimbursement to Medicaid providers for abortion services rendered to recipients, it would be premature to decide this case until such reimbursement is actually withheld. They suggest that the appropriate avenue of relief is for providers who have performed abortions for recipients to sue the State for payment under the provisions of G. L. c. 258, asserting the unconstitutionality of the funding restriction as the basis of their claim.

We think this argument misperceives the interest asserted by the plaintiffs, and takes a correspondingly unrealistic view of the effect of the challenged restrictions. Inescapably at stake in this case is the availability of medically necessary abortion services to the plaintiff class of Medicaid-eligible women. By definition, these women are financially incapable of affording these services themselves. See 42 U.S.C. § 1396. To require them to find a Medicaid provider who will perform an abortion in the face of an express prohibition on reimbursement, and who will then undertake the additional burden of litigating the constitutionality of that prohibition, would be to render whatever right they may have totally illusory.

The plaintiffs clearly allege that the challenged restriction will prevent them from obtaining abortions. Affidavits submitted by Medicaid providers indicate that, in practice, Medicaid providers will not perform any significant number of abortions in the hope that they may ultimately prevail in a lawsuit challenging this restriction. We think these allegations to be entirely sufficient to present an actual controversy appropriate for a declaration of rights. "For a doctor who cannot afford to work for nothing, and a woman who cannot afford to pay him, the State's refusal to fund an abortion is as effective an 'interdiction' of [a woman's right to choose an abortion] as would ever be necessary." *Singleton* v. *Wulff*, 428 U.S. 106, 118-119 n.7 (1976) (four Justices concurring).

Because the necessary predicates for maintaining this suit are present with respect to the plaintiff class of Medicaid-

eligible pregnant women, we need not dwell on the correlative claims of the class represented by Dr. Stubblefield. In part III of this opinion, we address only the constitutional claims of the recipient class of plaintiffs, and do not decide the parallel contentions made by the class composed of Medicaid providers.

C. *Statutory conflict*. The plaintiffs have not advanced any statutory ground for the relief they seek. Nevertheless, because such a ground arguably existed prior to the current fiscal year, we discuss briefly the possibility, now eliminated, of a statutory resolution of this case.

Under the supremacy clause, a conflict between State and Federal standards for Medicaid eligibility would render the State legislation invalid, at least to the extent of the inconsistency. See *ABCD, Inc. v. Commissioner of Pub. Welfare,* 378 Mass. 327, 336 n.14 (1979); *Preterm, Inc. v. Dukakis,* 591 F.2d 121, 134 (1st Cir.), cert. denied sub nom. *Preterm, Inc. v. King,* 441 U.S. 952 (1979). During the fiscal year 1980, the Massachusetts limitation on Medicaid funding for abortions, although never enforced, was more restrictive than the corresponding Federal legislation. The State limited funding to cases in which abortion was required to avert death, while the Federal appropriations included funding for abortion in certain cases of rape or incest. Compare Pub. L. No. 96-123, § 109, 93 Stat. 926 (1979), with St. 1979, c. 393, § 2, Item 4402-5000. Following *Preterm, Inc. v. Dukakis, supra,* the Federal Courts of Appeals which considered the issue were unanimous in holding that the Federal legislation established a minimum level of abortion funding, and that more restrictive State enactments were invalid. Two of these courts enjoined enforcement of the State statutes in question only in so far as they were more restrictive than the governing Federal law. See *Hodgson v. County Comm'rs, County of Hennepin,* 614 F.2d 601, 615 (8th Cir. 1980); *Zbaraz v. Quern,* 596 F.2d 196 (7th Cir. 1979), cert. denied sub nom. *Zbaraz v. Miller,* 448 U.S. 907 (1980) (decision on remand holding Hyde Amendment and Illinois statutory equivalent unconstitutional, 469 F. Supp.

1212 [N.D.Ill. 1979], rev'd sub nom. *Williams* v. *Zbaraz*, 448 U.S. 358 [1980]). See also *Committee to Defend Reproductive Rights* v. *Myers*, 93 Cal. App. 3d 492,     (1979) (156 Cal. Rptr. 73, 86-87 [1979]) (case deleted from official reporter; hearing granted). A fourth court invalidated the more restrictive State law in its entirety. See *Roe* v. *Casey*, 623 F.2d 829, 837 (3d Cir. 1980). See also *Right to Choose* v. *Byrne*, 165 N.J. Super. 443, 454 (Ch. Div. 1979).[14]

If only the State's fiscal 1980 restriction were before us, the remedial question would be crucial. If we were to invalidate the Massachusetts restriction entirely, the controversy presented might be resolved. However, by Pub. L. No. 96-536, § 109, 94 Stat. 3170 (1980), enacted December 16, 1980, the Congress has stated that "States are and shall remain free not to fund abortions to the extent that they in their sole discretion deem appropriate." It is thus clear that as to the State's fiscal year 1981 restriction — the only restriction which can now be enforced — no statutory conflict exists with the governing Federal legislation. We thus turn to the constitutional issues presented.

III. *Constitutional claims.* The plaintiffs mount a broad attack on the restriction of Medicaid funding for abortions to cases in which the procedure is necessary to prevent a woman's death. First, they argue that this form of restriction is an impermissible burden on the exercise of a fundamental right secured by the guarantee of due process implicit in art. 10 of our Declaration of Rights. In addition, they argue that the classification established by this legislation cannot survive the equal protection analysis articulated in *Marcoux* v. *Attorney Gen.*, 375 Mass. 63 (1978), and that this restriction discriminates on the basis of sex in violation of the State Equal Rights Amendment. Finally, the plaintiffs argue that this restriction does not meet even the traditional minimum rationality standard of equal protection.

---

[14] In *Harris* v. *McRae*, 448 U.S. 297, 325 (1980), and *Williams* v. *Zbaraz*, 448 U.S. 358, 368-369 & n.11 (1980), the Court left open the question whether the Hyde Amendment, prior to fiscal year 1981, established a statutory minimum for abortion funding.

Because we agree that the challenged restriction impermissibly burdens a right protected by our constitutional guarantee of due process, we do not reach the alternative grounds of invalidity asserted by the plaintiffs. Although the issue involved is difficult and of extraordinary importance, the framework for our analysis is well established. We begin by sketching the contours of the right asserted. We then inquire whether the challenged restriction burdens that right. Concluding that it does, we examine the justifications offered by the State in support of these enactments.

A. *The protected choice.* Our starting point is necessarily the landmark decision of the United States Supreme Court in *Roe* v. *Wade*, 410 U.S. 113 (1973). There, the Court held that a woman's decision whether or not to terminate a pregnancy by abortion falls within a constitutionally protected zone of privacy. *Id.* at 153. Without defining precisely either the scope of the right or its source, the Court made it clear that the right of the individual is not absolute. State regulations are permitted which advance a "compelling state interest" and are "narrowly drawn to express only the legitimate state interests at stake." *Id.* at 155. The Court identified two such interests, one in protecting the health of the pregnant woman, and the other in fostering potential human life. *Id.* at 159. "Each grows in substantiality as the woman approaches term and, at a point during pregnancy, each becomes 'compelling.'" *Id.* at 162-163. Dividing pregnancy into three stages, the Court weighed the State and individual interests present during each. During the first trimester, the Court held the right of individual choice to be paramount; accordingly, the State may not restrict abortions during this period beyond requiring that they be performed by a licensed physician. In the second trimester of pregnancy, the State's interest in maternal health was held to be sufficient to permit regulation reasonably related to such health concerns. Only at the point of fetal viability, beginning at approximately the seventh month of pregnancy, does the State's interest in potential

life become sufficiently compelling to support an outright prohibition of abortion except as necessary to save the life or health of the pregnant woman. *Id.* at 163-165. In light of these limits on State regulation, the Texas statute under consideration, which imposed criminal sanctions for the performance of any abortion not necessary to save a woman's life, was held to be overbroad and thus invalid under the due process clause of the Fourteenth Amendment to the United States Constitution. *Id.* at 164.

Although we are not unaware of the criticism leveled at *Roe* v. *Wade, supra,* we have accepted the formulation of rights that it announced as an integral part of our jurisprudence. We note that it has been repeatedly reaffirmed by the Supreme Court in decisions invalidating State laws burdening the abortion decision. See *Bellotti* v. *Baird,* 443 U.S. 622 (1979) (requirement of parental consultation and consent or court approval prior to permitting unmarried minors to undergo abortion); *Colautti* v. *Franklin,* 439 U.S. 379 (1979) (requirement that physician determine fetal viability prior to performing abortion; imposing criminal and civil sanctions for failure to exercise care to save fetal life); *Planned Parenthood* v. *Danforth,* 428 U.S. 52 (1976) (requirement of parental or spousal consent prior to abortion; prohibition of saline abortion after first trimester; imposing civil and criminal sanctions for failure to exercise care to save fetal life); *Doe* v. *Bolton,* 410 U.S. 179 (1973) (limiting those hospitals in which abortions could be performed; requiring prior hospital committee approval and concurrence of three doctors that abortion is necessary).

We have twice been called upon to apply the principles enunciated in *Roe* v. *Wade, supra,* in cases raising the question of the limits of permissible State intervention in the abortion decision. In *Doe* v. *Doe,* 365 Mass. 556 (1974), we held that a pregnant woman's husband had no right, whether constitutional or at common law, to declaratory and injunctive relief designed to prevent her from securing an abortion. We recognized that the line of cases culminating in *Roe* v. *Wade, supra,* "all . . . involved a shield for the

private citizen against government action, not a sword of government assistance to enable him to overturn the private decisions of his fellow citizens." *Doe, supra* at 560. We emphasized the principle of personal autonomy inherent in these cases; "[w]e would not order either a husband or a wife to do what is necessary to conceive a child or to prevent conception, any more than we would order either party to do what is necessary to make the other happy. . . . Some things must be left to private agreement." *Id.* at 563. In *Framingham Clinic, Inc.* v. *Selectmen of Southborough*, 373 Mass. 279 (1977), we held invalid a zoning by-law designed to exclude abortion clinics from the town. Again, we emphasized the "negative constitutional principle" underlying *Roe* v. *Wade, supra*; this principle "forbids the State to interpose material obstacles to the effectuation of a woman's counselled decision to terminate her pregnancy during the first trimester. Indeed, the need for scrupulous observance of this neutral or negative constitutional principle is felt all the more strongly as the State is seen to have no affirmative duty [to aid a woman to secure an abortion]." *Framingham Clinic, Inc., supra* at 288, citing *Maher* v. *Roe*, 432 U.S. 464 (1977).

The cases dealing specifically with a woman's right to make the abortion decision privately express but one aspect of a far broader constitutional guarantee of privacy. These cognate cases are linked by their recognition that "[t]he existence of a 'private realm of family life which the state cannot enter,' *Prince* v. *Massachusetts*, 321 U.S. 158, 166 (1944), is a cardinal precept of our jurisprudence." *Custody of a Minor (No. 1)*, 377 Mass. 876, 880 (1979). In the seminal case of *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728 (1977), in which we considered the limits of the State's power, or obligation, to impose life-prolonging treatment on a terminally ill incompetent in its care, we said that "[t]he constitutional right to privacy . . . is an expression of the sanctity of individual free choice and self-determination as fundamental constituents of life. The value of life as so perceived is lessened not by a decision to

refuse treatment, but by the failure to allow a competent human being the right of choice." *Id.* at 742. More recently, we noted "something approaching consensus" in support of the principle that "[a] person has a strong interest in being free from nonconsensual invasion of his bodily integrity, and a constitutional right of privacy that may be asserted to prevent unwanted infringements of bodily integrity." *In the Matter of Spring*, 380 Mass. 629, 634 (1980).[15]

In sum, we deal in this case with the application of principles to which this court is no stranger, and in an area in which our constitutional guarantee of due process has sometimes impelled us to go further than the United States Supreme Court. See, e.g., *District Attorney for the Suffolk Dist.* v. *Watson*, 381 Mass. 648 (1980) (recognizing the relevance of a fundamental right to life in invalidating death penalty); *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1 (1979) (recognizing indigent parents' right to court appointed counsel in State instituted proceeding to remove child from parents' custody). It is established that "[t]he decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices. That decision holds a particularly important place in the history of the right of privacy. . . . This is understandable, for in a field that by definition concerns the most intimate of human activities and relationships, decisions whether to accomplish or to prevent conception are among the most private and sensitive" (citations omitted). *Carey* v. *Population Servs. Int'l*, 431 U.S. 678, 685 (1977). Having

---

[15] This consensus is evident from a number of our recent decisions applying privacy principles in diverse areas, including parents' rights to custody of their children, *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1 (1979); *Custody of a Minor (No. 1)*, 377 Mass. 876 (1979); choice with regard to medical treatment, *Matter of Spring*, 380 Mass. 629 (1980); *Commissioner of Correction* v. *Myers*, 379 Mass. 255 (1979); *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728 (1977); sexual conduct, *Commonwealth* v. *Balthazar*, 366 Mass. 298 (1974); and drug use, *Marcoux* v. *Attorney Gen.*, 375 Mass. 63 (1978).

defined the right involved, we turn to the question whether it is infringed by the challenged funding restriction.[16]

B.  *Neutrality of the State regulation.*  In *Harris* v. *McRae*, 448 U.S. 297 (1980), and its companion case *Williams* v. *Zbaraz*, 448 U.S. 358 (1980), the Supreme Court of the United States upheld enactments substantially identical to those challenged here against claims that they violated the due process and equal protection components of the Fifth and Fourteenth Amendments to the United States Constitution.  In the view of five members of the Court, neither the Federal nor the parallel State funding restriction denied any federally protected constitutional right.  While granting the importance of a woman's interest in protecting her health in the scheme established by *Roe* v. *Wade, supra,* the Court held that "it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices.  The reason why was explained in [*Maher* v. *Roe,* 432 U.S. 464 (1977)]:  although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation.  Indigency falls in the latter category. . . . . Although Congress has opted to subsidize medically necessary services generally, but not certain medically necessary abortions, the fact remains that the Hyde Amendment leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all."  *Harris* v. *McRae, supra* at 316-317.[17]  The Court went on to reject claims based on the free exercise and establishment clauses of the First Amendment, and on the Fifth Amendment guarantee of

[16] As noted earlier, *supra* at 643-644, the presence of the plaintiff class of Medicaid-eligible pregnant women in this action obviates any necessity to examine at length the correlative right asserted by the plaintiff class of Medicaid providers represented by Dr. Stubblefield.

[17] In *Maher* v. *Roe,* 432 U.S. 464 (1977), the Court upheld the exclusion of purely elective, nontherapeutic abortions from Medicaid coverage.

equal protection.[18] Concluding that to be upheld the funding restriction need only be rationally related to a legitimate State interest, the Court held that the establishment of financial incentives making childbirth "a more attractive alternative" than abortion for Medicaid recipients has a "direct relationship to the legitimate [governmental] interest in protecting potential life." *Id.* at 325.

We are urged by the defendants to adopt this analysis of the interests here at stake. The plaintiffs, on the other hand, remind us that when asked to interpret the Massachusetts Constitution, this court is "not bound by Federal decisions, which in some respects are less restrictive than our Declaration of Rights." *Corning Glass Works* v. *Ann & Hope, Inc.*, 363 Mass. 409, 416 (1973). Accord, *District Attorney for the Plymouth Dist.* v. *New England Tel. & Tel. Co.*, 379 Mass. 586, 597 n.1 (1980) (Liacos, J., dissenting). See Wilkins, Judicial Treatment of the Massachusetts Declaration of Rights in Relation to Cognate Provisions of the United States Constitution, 14 Suffolk U.L. Rev. 887 (1980); Douglas, State Judicial Activism — The New Role for State Bills of Rights, 12 Suffolk U.L. Rev. 1123 (1978); Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977). We think our Declaration of Rights affords a greater degree of protection to the right asserted here than does the Federal Constitution as interpreted by *Harris* v. *McRae, supra.*

As we have demonstrated, the limitation on State action which is imposed by the fundamental right of privacy declared in *Roe* v. *Wade, supra,* is one of neutrality. We do not understand the plaintiffs here to assert either an absolute right to have abortions or an equivalent right to have their abortions subsidized by the State.[19] Their claim is

---

[18] In *Williams* v. *Zbaraz*, 448 U.S. 358, 368-369 (1980), the Court held *Harris* to be controlling as to the plaintiffs' equivalent Fourteenth Amendment equal protection claim.

[19] We emphasize again that this case, as narrowed by the order of the single justice, involves only the exclusion of lawful, medically necessary abortions from Medicaid coverage. See note 12, *supra.*

more limited. They point out that, in establishing the State Medicaid program, the Legislature has undertaken a broad commitment to subsidize medically necessary services for the needy. Family planning and pregnancy-related services, like all other services covered by the program, are offered subject only to a showing of medical necessity. Only subsidies for abortions are conditioned on a showing that the procedure is necessary to prevent death. It is this unique treatment which the plaintiffs claim is unconstitutional; their claim is thus limited to an assertion of "the right to have abortions nondiscriminatorily funded." *Singleton* v. *Wulff*, 428 U.S. 106, 118-119 n.7 (1976) (four Justices concurring).

It is elementary that "when a State decides to alleviate some of the hardships of poverty by providing medical care, the manner in which it dispenses benefits is subject to constitutional limitations." *Maher* v. *Roe*, 432 U.S. 464, 469-470 (1977). While the State retains wide latitude to decide the manner in which it will allocate benefits, it may not use criteria which discriminatorily burden the exercise of a fundamental right. *Massachusetts Pub. Interest Research Group* v. *Secretary of the Commonwealth*, 375 Mass. 85, 93 (1978). *Opinion of the Justices*, 375 Mass. 795, 806 (1978), and cases cited.

When the question is whether a selective grant of benefits impinges on a right held to be fundamental, it is unimportant whether the burden imposed is direct or indirect. In *Healy* v. *James*, 408 U.S. 169 (1972), a State college denied recognition to a group of students who wished to form a local chapter of Students for a Democratic Society (SDS), on the basis that the goals and methods of the national SDS organization were antithetical to the educational process and ideals of the college. By this action, the students were denied access to campus bulletin boards and the student newspaper, and were prohibited from using campus facilities for their meetings. Notwithstanding the fact that the State had imposed no direct obstacle to the exercise of the students' First Amendment rights, the Court held this action to be

unconstitutional. "We may concede, as did Mr. Justice Harlan in his opinion for a unanimous Court in *NAACP* v. *Alabama ex rel. Patterson*, 357 U.S., at 461 [1958], that the administration 'has taken no direct action . . . to restrict the rights of [petitioners] to associate freely . . . .' But the Constitution's protection is not limited to direct interference with fundamental rights. The requirement in *Patterson* that the NAACP disclose its membership lists was found to be an impermissible, though indirect, infringement of the members' associational rights. Likewise, in this case, the group's possible ability to exist outside the campus community does not ameliorate significantly the disabilities imposed by the President's action. We are not free to disregard the practical realities. MR. JUSTICE STEWART has made the salient point: 'Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference.' *Bates* v. *City of Little Rock*, 361 U.S. 516, 523 (1960). See also *Sweezy* v. *New Hampshire*, 354 U.S., at 263 [1957] (Frankfurter, J., concurring in result); *Watkins* v. *United States*, 354 U.S. 178, 197 (1957)." *Healy* v. *James, supra* at 183. See *Harris* v. *McRae, supra* at 334-335, and cases cited (Brennan, J., dissenting, with whom Marshall and Blackmun, JJ., joined). See also *Right to Choose* v. *Byrne*, 169 N.J. Super. 543, 551-552 (Ch. Div. 1979); The Supreme Court, 1979 Term, 94 Harv. L. Rev. 77, 100 & n.27 (1980).

The principle underlying these cases is not novel in our own jurisprudence. In *Schulte* v. *Director of the Div. of Employment Security*, 376 Mass. 107 (1978), we remanded for more explicit findings a case in which it appeared that unemployment benefits had been denied because the claimant refused to be available to work on the Jewish Sabbath. In a concurring opinion, two Justices commented that "[i]t goes without saying that any decision by a State agency that, in order to qualify for benefits, a claimant must be available for work on a day which the claimant observes as the Sabbath is invidious and unconstitutional discrimina-

tion. *Sherbert* v. *Verner*, 374 U.S. 398 (1963)." *Schulte*, *supra* at 111 (Abrams, J., concurring, with whom Liacos, J., joined). Similarly, in *Opinions of the Justices*, 372 Mass. 874 (1977), we decided that a statute requiring teachers to lead their classes in a salute to the flag and pledge of allegiance would be unconstitutional even severed of a provision penalizing a teacher who failed to obey the statute's command. "Even if we were to determine that it would be unconstitutional to visit any adverse consequences on a teacher for his failure to comply with [this law], the very existence of the statutory mandate might inhibit a teacher from exercising whatever constitutional right he may have to refrain from leading his class in the recitation of the pledge of allegiance. Indirect discouragement of the exercise of First Amendment rights has been condemned." *Id.* at 877. See *Broderick* v. *Police Comm'r of Boston*, 368 Mass. 33, 37 (1975), cert. denied sub nom. *Broderick* v. *DiGrazia*, 423 U.S. 1048 (1976); *Opinion of the Justices*, 332 Mass. 763, 767 (1955).

We think the instant case stands on the same footing as those cited. Our prior decisions demonstrate that our Declaration of Rights affords the privacy rights asserted here no less protection than those guaranteed by the First or Fifth Amendments to the Federal Constitution. In our view, "articulating the purpose [of the challenged restriction] as 'encouraging normal childbirth' does not camouflage the simple fact that the purpose, more starkly expressed, is discouraging abortion." Perry, The Abortion Funding Cases: A Comment on the Supreme Court's Role in American Government, 66 Geo. L.J. 1191, 1196 (1978). As an initial matter, the Legislature need not subsidize any of the costs associated with child bearing, or with health care generally. However, once it chooses to enter the constitutionally protected area of choice, it must do so with genuine indifference. It may not weight the options open to the pregnant woman by its allocation of public funds; in this area, government is not free to "achieve with carrots what [it] is forbidden to achieve with sticks." L. Tribe, Ameri-

can Constitutional Law § 15-10, at 933 n.77 (1978). We are therefore in agreement with the views expressed by Justice Brennan, writing in dissent to *Harris* v. *McRae, supra* at 833: "In every pregnancy, [either medical procedures for its termination, or medical procedures to bring the pregnancy to term are] medically necessary, and the poverty-stricken woman depends on the Medicaid Act to pay for the expenses associated with [those] procedure[s]. But under [this restriction], the Government will fund only those procedures incidental to childbirth. By thus injecting coercive financial incentives favoring childbirth into a decision that is constitutionally guaranteed to be free from governmental intrusion, [this restriction] deprives the indigent woman of her freedom to choose abortion over maternity, thereby impinging on the due process liberty right recognized in *Roe* v. *Wade*."

C. *Interest balancing.* Our inquiry does not end with the conclusion that this funding restriction burdens the plaintiffs' fundamental right of choice. It remains to examine the interests asserted by the State to justify this measure. As we noted in *Framingham Clinic, Inc.* v. *Selectmen of Southborough*, 373 Mass. 279, 284 (1977), "[i]t is not easy to find a precise answer to the question what burden a State must sustain in order to establish the validity of a regulation impinging on the constitutional right during [the early period of a pregnancy] . . . ." The Federal cases suggest that, in this context, "'[c]ompelling' is . . . the key word; where a decision as fundamental as that whether to bear or beget a child is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests." *Carey* v. *Population Servs. Int'l*, 431 U.S. 678, 686 (1977). We have at times expressed the relevant test in similar language. See *Massachusetts Pub. Interest Research Group* v. *Secretary of the Commonwealth*, 375 Mass. 85, 93 (1978); *Opinion of the Justices*, 375 Mass. 795, 806 (1978). At the same time, we have recognized to some extent the limitations inherent in such a rigid formulation. See *Mar-*

*coux* v. *Attorney Gen.*, 375 Mass. 63, 65 n.4 (1978) ("The cases at times speak of legislation which need only undergo a test of 'reasonable relation' and legislation that must survive 'strict scrutiny,' but we conceive that these soubriquets are a shorthand for referring to the opposite ends of a continuum of constitutional vulnerability determined at every point by the competing values involved"). Our recent cases in this area exemplify a more flexible approach to the weighing of interests that must take place. See *In the Matter of Spring, supra* at 634-635; *Commissioner of Correction* v. *Myers, supra* at 261; *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 740-741 (1977).

The basic judicial authority defining the interests involved when a State seeks to regulate the performance of abortions is, of course, *Roe* v. *Wade,* 410 U.S. 113 (1973). While the balance of interests struck in that case is not controlling here, it is nevertheless instructive to look to that case for guidance. The Supreme Court defined two State interests that are implicated by the abortion procedure: the first, "in preserving and protecting the health of the pregnant woman"; and a second, distinct interest, "in protecting the potentiality of human life." *Roe* v. *Wade, supra* at 162. It seems obvious — and the defendants do not argue to the contrary — that the instant enactments in no way further the State interest in maternal health. Thus, under *Wade,* the only State interest at stake in this case is the interest in preserving potential life.[20] In *Roe* v. *Wade, supra* at 162-165, the Court held that interest to be present throughout a woman's pregnancy, but to be "compelling" only from

[20] The defendants make no argument that these restrictions are calculated to conserve funds. This is not surprising; other courts which have considered the question have found that, on a program-wide basis, the cost of providing the medical services necessary to support women through to childbirth, even offset by available Federal reimbursement, exceeds the cost of providing abortion services to eligible women who want them. See *Preterm, Inc.* v. *Dukakis,* 591 F.2d 121, 126 n.4 (1st Cir.), cert. denied sub nom. *Preterm, Inc.* v. *King,* 441 U.S. 952 (1979); *Right to Choose* v. *Byrne,* 165 N.J. Super. 443, 449 (1979). See also *Harris* v. *McRae, supra* at 355 n.9 (Stevens, J., dissenting).

the point of fetal viability onward, or during approximately the last three months of pregnancy.

This formulation, if accepted, would prove fatal to the challenged restriction. Rather than mechanically accepting this result, however, we prefer to test these enactments by the balancing principles which we have developed in our own recent decisions.

Perhaps the clearest exposition of those principles in a case presenting an analogous, although not identical, issue is found in *Commissioner of Correction* v. *Myers, supra.* The Commissioner sought declaratory and injunctive relief to establish that he could compel a prisoner in the State prison to undergo medically necessary hemodialysis. We began our analysis of this issue by reference to *Superintendent of Belchertown State School* v. *Saikewicz, supra,* our leading case on the law involving involuntary life-saving medical treatment. In *Saikewicz,* we recognized an interest of constitutional dimension in an individual's freedom from nonconsensual invasions of bodily integrity; and further, that such an interest, or right, may be asserted to prevent infringements of bodily integrity in circumstances defined by a proper balancing of State and individual interests. *Id.* at 738-745. See *Myers, supra* at 261. Both *Saikewicz* and *Myers* identify four countervailing State interests present in cases involving involuntary medical treatment: "(1) the preservation of life; (2) the protection of the interests of innocent third parties; (3) the prevention of suicide; and (4) the maintenance of the ethical integrity of the medical profession." *Myers, supra* at 262. The interest primarily implicated in *Myers* was in preserving life, since hemodialysis treatment permitted the defendant to live an otherwise normal life. Against that strong interest, we balanced the individual's interest in being free of the hemodialysis treatments, an invasion of his bodily integrity we thought to be significant, although not great. Viewed in isolation, we thought these two interests to yield "a very close balance of interests." *Id.* at 263. The decisive factor thus became the State's interest in the orderly administra-

tion of its prisons, particularly since the defendant, by refusing treatment, sought to extort concessions regarding his placement in the prison system. *Id.* at 264. Adding to this balance the State's interest in maintaining the ethical integrity of the medical profession, we concluded that the weight of the State interests was sufficient to allow the Commissioner to use any reasonably necessary measures to save the prisoner's life. *Id.* at 265.

Here, as in *Myers*, the State interest primarily involved is in preservation of life, albeit potential life.[21] Against this interest, we must balance the interest of the pregnant woman in choosing a medically necessary abortion. We think that there can be no question that the magnitude of this invasion far exceeds that of the compelled medical treatments challenged in *Myers*; the nine months of enforced pregnancy inherent in effectuating these regulations are only a prelude to the ultimate burden the State seeks to impose. See Tribe, *supra* at 924 ("If a man is the involuntary source of a child — if he is forbidden, for example, to practice contraception — the violation of his personality is profound; the decision that one wants to engage in sexual intercourse but does not want to parent another human being may reflect the deepest of personal convictions. But if a woman is forced to bear a child — not simply to provide an ovum but to carry the child to term — the invasion is incalculably greater. Quite apart from the physical experience of pregnancy itself, an experience which of course has no analogue for the male, there is the attachment the experience creates, partly physiological and partly psychological, between mother and child. Thus it is difficult to imagine a clearer case of bodily intrusion, even if the original conception was in some sense voluntary"). Where the balance of these interests in *Myers* was close, we think the balance in this

---

[21] At least prior to viability, we are constrained by *Roe* v. *Wade*, 410 U.S. 113, 156-159 (1973), from imputing to the State any interest in protecting the fetus as a "third party."

case to be decisively in favor of the individual right involved.[22] We therefore conclude that this restriction cannot be implemented as legislatively enacted.

IV. *Remedy.* We have concluded that the challenged restriction is invalid in so far as it prohibits the use of State Medicaid funds to reimburse authorized providers for lawful, medically necessary abortion services rendered to qualified Medicaid recipients. We now address the question of fashioning an appropriate remedy. The question posed is whether simply to invalidate the existing restriction in so far as it is constitutionally offensive or whether it is necessary to nullify the Medicaid appropriation for the current fiscal year in its entirety.

The parties agree that this question is governed by the rule stated in *Opinion of the Justices*, 330 Mass. 713, 726 (1953): "When a court is compelled to pass upon the constitutionality of a statute and is obliged to declare part of it unconstitutional, the court, as far as possible, will hold the remainder to be constitutional and valid, if the parts are capable of separation and are not so entwined that the Legislature could not have intended that the part otherwise valid should take effect without the invalid part." See *DelDuca* v. *Town Adm'r of Methuen*, 368 Mass. 1, 13-14 (1975).

The defendants argue that this is indeed a case in which the Legislature could not, or at least would not, have intended the Medicaid program to continue had they been aware of the invalidity of the abortion funding restriction.[23] They point, in support of this position, to the long record of legislative opposition to Medicaid funded abortions and to the deep division in public opinion still existing with regard

---

[22] Although we do not regard it as decisive, we note that placing physicians in the position of choosing between their livelihood and the preservation of the health of a patient for whom abortion is a medical necessity cannot be thought to foster the ethical integrity of the profession.

[23] In Part II (A) of this opinion we have disposed of the argument that "extension" of the benefit would violate art. 30 of the Declaration of Rights of the Constitution of the Commonwealth.

to abortion. They accordingly suggest that we must now invalidate the current Medicaid appropriation in its entirety.

We cannot agree. We do not doubt that there exists in the Legislature a deep-seated resistance to public funding for abortion. Equally clear, however, is the Legislature's strong commitment over a period of fifteen years to a State Medicaid program. The Medicaid appropriation has become the largest single item in the State's budget. The program goes far beyond federally mandated requirements, both in terms of standards of eligibility and in terms of the scope of the services offered. It is obviously a program on which a large number of our State's needy people rely to meet their most urgent needs. Moreover, this is not a case in which a decision to sever the funding restriction will result in an increased financial burden to the State. Cf. *ABCD, Inc.* v. *Commissioner of Pub. Welfare*, 378 Mass. 327, 338-339 (1979); *Rosado* v. *Wyman*, 397 U.S. 397, 420-422 (1970). On the contrary, as we have previously explained, severing the offending restriction in this instance will create a financial benefit to the program as a whole.

The principle embodied in the rule governing this remedial question is straightforward: we must seek to minimize the scope of any necessary intrusion into the legislative sphere. We think a nullification of the Medicaid program in its entirety would represent a far greater intrusion into that sphere than a remedy excising only the offending restriction. We therefore remand this case to the county court with instructions that the single justice enter a judgment (1) declaring that the plaintiff class of Medicaid-eligible pregnant women is entitled to nondiscriminatory funding of lawful, medically necessary abortion services, and (2) enjoining the enforcement of G. L. c. 29, § 20B, and St. 1980, c. 329, § 2, Item 4402-5000, in so far as these statutory provisions would prevent reimbursement to Medicaid providers for services in performing lawful, medically necessary abortions on Medicaid-eligible pregnant women.

*So ordered.*

HENNESSEY, C.J. (dissenting). I dissent. I do not subscribe to the opinion of the majority of the court that the legislation violates the guarantee of due process implicit in art. 10 of the Massachusetts Declaration of Rights. Nor do I believe that the legislation contravenes either the equal protection provision or the Equal Rights Amendment of our State Constitution.

The constitutional arguments of the plaintiffs are rooted in *Wade*, which held that the liberty protected by the United States Constitution includes the freedom of a woman to decide whether to terminate a pregnancy. At the same time, the United States Supreme Court also affirmed in *Wade* that a State has legitimate interests in protecting the health of the mother, and protecting potential human life. These State interests become more substantial as the woman approaches term until, at viability, usually in the third trimester, the State interest justifies a criminal prohibition against abortion.

The plaintiffs here correctly do not contend that they have a right to public funding of abortions. See *Maher* v. *Roe*, 432 U.S. 464 (1977). They also rightly concede the State's privilege to choose to fund no medical expenses of indigent persons, including expenses associated with pregnancy. They simply contend that the State may not provide for the payment of medically necessary expenses of childbirth, but simultaneously refuse to fund the medically necessary expenses of therapeutic abortion.

The United States Supreme Court, faced with the precise issue presented here, held that there was no impediment in the United States Constitution to congressional funding of childbirth but not of certain abortions. *Harris* v. *McRae*, 448 U.S. 297 (1980). The majority's opinion here, on the contrary, concludes that the legislative action impermissibly burdens a right protected by the guarantee of due process in our Massachusetts Declaration of Rights.

The majority opinion states that it accepts the formulation of rights announced in *Wade*. In my view, it nevertheless then proceeds to modify and extend the *Wade* principles. It

relies upon a series of precedents which stem from *Wade*, but all of these cases concern obstacles which intrude on the woman's freedom of choice.[1]   This court has defined, I think correctly, the constitutional principle of *Wade* as forbidding the State to "interpose material obstacles to the effectuation of" the woman's decision to terminate her pregnancy during the first trimester. *Framingham Clinic, Inc.* v. *Selectmen of Southborough*, 373 Mass. 279, 288 (1977). The majority rely upon that definition in this case, concluding that the decisions of indigent women may well be affected by the disparity in funding, and those decisions will likely favor birth over abortion.   It is clear to me that the majority thus equate a financial inducement toward childbirth with an obstacle to a woman's freedom to choose abortion. The logic fails.   It may be an appropriate argument to address to the Legislature, but it is not a valid premise for a conclusion of unconstitutionality.   It is also a major departure from *Wade* and the opinions which have followed that case.

I do not dispute that this court is free in appropriate circumstances to decide that the Massachusetts guarantee of due process is more extensive than its Federal counterpart.[2]

---

[1] The majority cite the following:   "*Bellotti* v. *Baird*, 443 U.S. 622 (1979) (requirement of parental consultation and consent or court approval prior to permitting unmarried minors to undergo abortion); *Colautti* v. *Franklin*, 439 U.S. 379 (1979) (requirement that physician determine fetal viability prior to performing abortion; imposing criminal and civil sanctions for failure to exercise care to save fetal life); *Planned Parenthood* v. *Danforth*, 428 U.S. 52 (1976) (requirement of parental or spousal consent prior to abortion; prohibition of saline abortion after first trimester; imposing civil and criminal sanctions for failure to exercise care to save fetal life); *Doe* v. *Bolton*, 410 U.S. 179 (1973) (limiting those hospitals in which abortions could be performed; requiring prior hospital committee approval and concurrence of three doctors that abortion is necessary)."

[2] I suggest that the majority inappropriately rely upon *District Attorney for the Suffolk Dist.* v. *Watson*, 381 Mass. 648 (1980), as support for their result here.   This court in *Watson* did not rely upon our State Constitution's guarantee of due process, but its prohibition of cruel or unusual punishment.   In finding the death penalty statute unconstitutional, the court relied on, among other things, what it considered to be an indisputable conclusion that the criminal justice system inevitably imposes the

Nevertheless, there are the best of reasons in policy and logic why the court should not do so in this case. One of the principles of *Wade* which the majority profess to accept is the recognition of the State's interest in the protection of potential life. I think that one effective way in which the State can advance this interest, aside from exercising its limited power to regulate and prohibit abortion,[3] is to provide disparate funding which favors birth over abortion. The majority have now denied that privilege to the State, although the State has not by its legislation erected "obstacles" (in any sense which will find support in *Wade, Maher, McRae* or Webster's Dictionary) to a woman's freedom to choose. Since the State has no constitutional duty to provide medical expenses for abortion or any other medical need, the ease with which an abortion may be obtained remains unchanged by the Legislature's decision to pay for the necessary medical expenses of childbirth. The conclusion of the majority that the State must be "neutral" ignores, and largely nullifies the State's long recognized interest in protecting potential life. The majority's extension of due process is particularly inappropriate in light of the principle that "[c]onstitutional concerns are greatest when the State attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader." *Maher* v. *Roe*, 432 U.S. 464, 476 (1977).

The majority, having decided this case on a due process approach, recognized that there was no necessity to examine the plaintiffs' assertions that the legislation violates the provision in our State Constitution for equal protection of the laws, and the related provision in the Equal Rights Amendment. I conclude that these arguments, like those addressed to due process, fail. The legislation was not

---

death penalty arbitrarily and discriminatorily. *Id.* at 665-671. I perceive no similarly persuasive constitutional reasoning to support the majority's decision in this case.

[3] I trust and assume that one of the principles of *Wade* which the court accepts is that which permits a limited intrusion by the State into the pregnant woman's freedom of choice, particularly by the processes of the criminal law and particularly in the third trimester.

predicated on a suspect classification. The principal incidence of the disparate treatment inherent in the legislation falls upon the indigent. Poverty is not a suspect classification. *McRae, supra* at 323. *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U.S. 1 (1973). It remains then, in order to establish constitutionality, to establish only that the legislation is rationally related to a legitimate governmental objective. There clearly is a rational relationship of the legislation to the State's legitimate interest in protecting potential life of the fetus. The equal protection argument of the plaintiffs fails.

The plaintiffs also are not assisted by the Equal Rights Amendment to the Massachusetts Constitution, which is intended to eliminate gender-based discrimination. This court has not yet fully addressed the question of what, if any, proof of discriminatory intent is required to make out a prima facie showing of discrimination under the Equal Rights Amendment. Cf. *School Comm. of Braintree* v. *Massachusetts Comm'n Against Discrimination,* 377 Mass. 424, 429 (1979), and cases cited (involving claims of employment discrimination under G. L. c. 151B, § 4). I find it unnecessary to resolve this question here, because I do not believe this case involves a gender-based classification cognizable under the Equal Rights Amendment. Inescapably, the motive for the challenged legislation lies in opposition to abortion and is based on the State's valid interest in preserving life. The legislation is directed at abortion as a medical procedure, not at women as a class.

It is clear that the matter in which this court now intrudes is a matter for the Legislature. "It is not the mission of this Court or any other to decide whether the balance of competing interests reflected in [the disparate treatment by the Legislature of childbirth and abortion] is wise social policy. If that were our mission, not every Justice who has subscribed to the judgment of the Court today could have done so." *McRae, supra* at 326.

I would direct the single justice to enter a judgment declaring that the challenged legislation is constitutional in all respects under the Constitution of Massachusetts.